Mr. Justice Merrick
delivered the opinion of the court.
This suit was instituted by five citizens of the District of Columbia, owners of property in the northern part of Seventh street, for the purpose of enjoining the Western Union Telegraph Company from erecting.a line of telegraph poles along a certain portion of that street. It seems that this company, having for twenty years or more maintained lines of telegraph in the city of Washington, in the month of May last, with a view, as they allege, to diminish the number of overgi’ound communications in the city, and to aid and advance themselves towards the ultimate establishment of an entire system of underground telegraphs, applied to the proper authorities of the District for their consent and concurrence in readjusting their lines so that they might lay an experimental line of underground telegraph through certain streets of this city, and, in connection with and in fortification of that, to erect a certain partial and temporary line of poles to connect with the underground system in order to supplement it as a guard against any accidents in the working of the undei’ground system, they alleging and averring that the underground system of telegraphy was yet an experimental one, and that while they desired to keep pace with the full progress of experimental science in that regard, yet with a due respect to the safety and permanency of their business, it would be rash and unwise and inconsiderate in them to abandon it altogether, and to rely exclusively, in the present unsettled state of the art, upon the underground system, interruptions in which, if they should happen to occur, would be of momentous consequence to the commerce of the country, to their business, and to the various interests which are dependent upon the promptness and efficiency of the discharge of the duties of that company.
In their application to the Commissioners for permission to make the change they indicated that the effect of the change would be to shorten and diminish by some ten or twelve miles the amount of serial telegraph which they now have in the city, and to that extent that it would be a benefit to the city.
*433 Under these circumstances they applied for the permit to make the underground connection and to make the change in the overground arrangement along Seventh street to conform to and to aid the experimental line. Permission was granted to them by the Board of Commissioners who have charge and supervision of . the regulation and control of the streets of the city of Washington.
In that state of the case these five complainants, one the possessor of a feed store, one the possessor of a drug store, two the possessors of stove stores, and one the possessor of a hotel, applied to the equity branch of the court to enjoin the erection of the telegraph along the line of Seventh street, upon the ground, first, that it was a public nuisance, and incidental to the public nuisance that it was a great private nuisance and inconvenience to themselves. The injunction was granted by the court below, and an appeal has been taken to this court.
The respondents justify upon three grounds. First, that they had the lawful authority under the act of Congress of 1866 to erect telegraph poles and telegraph lines in the manner proposed; secondly, that the manner of the erection was prudential in all regards and accompanied with the least possible inconvenience to the public; and, thirdly, that there was no damage whatsoever accruing or likely to accrue from the exercise of these faculties to the parties complainant, which would justify the interposition of a court of chancery by means of injunctive relief against a,nuisance.
The first and important question, therefore, arising under this state of the case is, was there any authority or right in the telegraph company to use the streets of the city of Washington at all for the purposes of telegraphy ? They maintain their authority by virtue of the act of Congress of 24th of July, 1866, and, on the other hand, the complainants maintain that that act of Congress is in no sense applicable to the District of Columbia, and that whatever authority the defendants had or might have had at any time for the erection or maintenance of lines of telegraph in the city was to be derived altogether from the joint resolution of Congress *434 approved March 3, 1863, under which they, it seems, had professed at one time to erect certain lines of telegraph. And they maintain that even under that resolution they had no power to maintain any of their lines because they had not conformed to the requirements of that resolution, and that resolution having been a special grant to this defendant, the defendant could not, even if other companies might, act under the authority of the law of 1866 — that the defendants could not act upon it, because they were limited by the special privileges of the joint resolution of 1863.
Much argument was had upon the doctrine that where there is a special law and a general law, the special law is to go along w'ith the geueral law, and that whoever has claimed a privilege under the special law' cannot come within the terms and provisions of the general law itself. There is no need for the court to criticise very closely or to review the authorities about the respective bearing of special and general laws upon each other in the matter of interpretation ; for, after all, those artificial rules w'hich were relied upon in the argument are mere aids of interpretation and not themselves the groundwork of interpretation. The first and cardinal rule in the interpretation of a statute is to look to the statute itself, the meaning, the scope and the object, of the statute; and if, upon the face of it, you can gather plainly what was the intention of the legislature, those incidental rules which are mere aids to be invoked where the meaning is clouded, are not to be regarded.
Now, what is the act of 1866, and what w'as the design and purpose of it? Upon its face it calls itself “An act to aid in the construction of telegraph lines, and to secure to the Government the use of the same for postal, military and other purposes.” Here is a great scheme of progress— material progress — announced by the legislature. Its purpose, “to aid in the construction of telegraph lines” — with a view to w'hat? To the largest purposes of Government; “to secure to the Government the use of the same for postal, military and other purposes;” thus' shadowing forth those great necessities which are growing upon us day by *435 day in the exercise of the commercial and postal necessities of this great nation; and with a view to effectuate those ends the legislature has declared “that any telegraph company now organized, or which may hereafter be organized under the laws of any State in this Union, shall have the right — not the privilege — to construct, maintain and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post-roads of the United States, which may have been or may hereafter be declared such by act of Congress, and over, under or across the navigable streams or waters of the United States,” etc.
No more plenary power could be embraced within the terms of a statute than is declared upon the face of this statute — “ any telegraph company now organized, or which may hereafter be organized, under the laws of any State in this Union, shall have the right to construct, maintain and operate lines of telegraph ” — with what view? In order, amongst other things, as declared upon the face of the statute, “ that telegraphic communications between the several Departments of the Government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be at rates to be annually fixed by the Postmaster-General;” and further, as is contemplated in the third section, that the United States shall have the privilege at any time after five years to become possessed of and own all these lines for certain ascertained prices to be determined according to the terms of the statute .with a view to the great purposes of Government.
Such being the nature, purpose and scope of the statute, does it come within the principle of any sound construction to maintain that a resolution of three years preceding, which gave a special privilege to certain lines of a telegraph company to use the highways, roads, streets and grounds of the District of Columbia. I say, is it consistent with any sound rule of construction of statutes to maintain that such a statute, with such comprehensive objects, is to be dwarfed *436 with reference to any of these great instrumentalities of commerce by a reference to the resolution of 1863 of three years before, which granted a more restricted privilege to certain telegraph companies to use any of the highways, roads or streets of the District of Columbia under certain circumstances? Is there anything in the nature of the two acts which requires the general power, contemplating the general good of the nation, to be exercised by any company that shall establish itself so as to be a useful instrumentality of the Government of the United States, to be dwarfed by saying that it is narrowed under the privilege of this antecedent resolution, and that the small personal privilege is to stand as a qualification and restriction upon a general statute made in pursuance of a great national and general policy?
It seems to me that it does not require reference to authority; it scarcely requires a momentary appeal to right reason to see that this resolution of 1863 can be in no sense a qualification of the absorbing power granted by the act of 1866. It is perfectly true that where a special statute is in existence, and there is a general law also, passed subsequently, that the special statute may be construed, and ought to be construed, in accordance with the general law. But where the general law is all-absorbent — takes up everything and embraces what and more than was, by any possibility, contemplated by the special resolution — it seems, as I say, contrary to right reason to maintain that the general statute can, in any sense, be qualified or restricted, and that universal right can be dwarfed and narrowed by an antecedent special privilege granted to an individual or to a corporation for a special purpose.
For these reasons it seems that the resolution of 1863 can, in no sense, qualify the general power and right granted by the act of 1866.
Now, what was that power? To extend its lines over any of the post-roads of the United States. Is not the District of Columbia a part and parcel of the United States, and are not the postal roads in the District of Columbia *437 within the scope, object and spirit of a law providing for the most extended postal facilities to the people of these United States? Is not the general Post-Office here, the very focus from which all the postal privileges and postal communications are to emanate? Is not the Government of the United States entitled, and the citizens of the United States entitled, to the freest and fullest postal facilities into the very heart of the city of Washington? And, therefore, can it be said in any sense of the law, that the District of Columbia shall not be embraced, its postal roads shall not be embraced, in the contemplation of a general statute having such a large and beneficial purpose in view? Such an idea has no lodgment in the mind of this court. While this statute is made applicable to this District by the express provision of the law which declares that all laws of the United States not inapplicable are operative within the District of Columbia, yet it may well be put on the broader ground that on the very face of the statute itself, by the necessities of the statute and the contemplation of the law, the District of Columbia was fully embraced within the act of 1866. If so, then, notwithstanding this defendant may have exercised a privilege under-the restricted powers conferred by the joint resolution of 1863, it is not debarred from the rights conferred upon every company within the borders of the United States by virtue of the act of 1866.
Having, then, this right the defendant applied to the Commissioners of the District, who have, under the general law, the power to regulate and control and supervise the use of the streets of the city of Washington, for permission to erect its lines of telegraph upon these certain streets which are indicated. It would have had the right to erect them, under this law of Congress, without the permission of the Commissioners of the District of Columbia. But, inasmuch as the Commissioners are charged with the supervision of the streets, the control and regulation of them, it was appropriate that they should see that, in the exercise of a right granted by law, there was no infringement of the correlative rights of the public, and that the right, when ex *438 ercised, should be exercised in due subordination to the rights of others, and in conformity to such regulations and prescriptions as should insure the least possible injury to the rights of any individual or the rights of travel and convenience of the general public. It was, therefore, eminently appropriate that application should be made, and that this thing should be done in subordination to and with the consent and approval of the judgment of the Commissioners of the District of Columbia.
We need not, in that aspect of the case, therefore, consider whether the Commissioners would have had the power, independently of the act of Congress, to grant the right to the use of the streets for such a purpose. The right is granted, and all that is contended for on the part of the respondents in this case is, that they shall have the right subject to the reasonable control by the Commissioners of the District, whose duty it is to control the exercise of any right within the District under the general police powers which they exert for the public good in respect of such matters.
That being so, the Commissioners having given their consent, the law of Congress having granted the power, it cannot be said that there can be any public nuisance arising out of the exercise of the grant in the mode proposed on the part of the defendants. The question of a public nuisance is entirely set at rest by the grant of power on the part of Congress and the concurrence of the guardians of the welfare of the public through the instrumentality of the Commissioners of the District.
The question, how'ever, remains : Was there, in the exercise of this right, or in the proposed exercise of this right, any private nuisance contemplated which should be restrained by the interposition of a court; because it must be conceded that while there may be a grant of authority on the part of the Federal Government to use its property, or the grant on the part of any public authority to use the public property, it must be done always with due regard to the rights of private citizens, and if the right of a private citizen be invaded it is to stand in just compensation before the tribu *439 nals of justice. No man’s right is to be invaded, no matter by what authority or by what power; at the same time no man has a right to set up his caprices so as to prevent the just exercise of rights for the benefit of the public, whether by the public itself or by any private agency which the public chooses to adopt as the instrument for carrying out the purposes of the public welfare.
Before we consider the gravamen of the private grievances alleged on the part of the complainants here, it is well enough to see what the general rules of law are which regulate applications for redress of this sort on the part of any citizen who applies for injunctive relief to a court of chancery. We need not go outside of two leading decisions pronounced by the Supreme Court of the United States as to the measure of chancery power in this respect. There has been a great deal said and a great deal written with regard to the extent of injunctive relief, and a great deal of conflict and confusion in decisions in various places. But, happily, as we have the most august tribunal in the world to lay down the rule of action for us, wherever they have spoken it is euough for us to recognize and be governed by what they have said, leaving nice distinctions and complicated rules elsewhere to adjust themselves as they best may under the administration of law not governed and controlled as we are by this one tribunal to which we can resort with so much confidence.
In the second of Black’s Reports, in the case of the Mississippi & Missouri Railroad Company vs. Ward, the rule was laid down by the Supreme Court. That was an application to restrain the erection of a bridge, at Rock Island, over the. Mississippi river. The court used this language, at page 494:
“ In the next place: Is the bridge west of the Illinois boundary an unreasonable obstruction, and therefore a nuisance that a court of chancery can lawfully remove ? In considering this question we must be governed by the same rule on which a court of law could proceed in case of an indictment against the bridge company for committing the nuisance; and the rule is that if the abridgment of the right *440 of passage occasioned by the erection was for a public purpose, to produce a public benefit, and if the erection was in a reasonable situation, and a reasonable place was left for the passage of vessels on the river, then it is not an unreasonable obstruction and indictable.
“Then, again, the obstruction to navigation must be plainly a nuisance within this rule before it can be removed by decree. If the proceeding was by indictment, and the jury doubted whether the obstruction was a nuisance or not, they would be instructed to acquit the defendant; and so, if this case was referred to a jury to try the fact, and they doubted, they would be bound to acquit. And the same rule applies in a court of chancery where the court ascertains the fact of nuisance.”
That is in regard to a public nuisance -where a private party seeks to restrain the injury to himself through an operation of a public nuisance.
In the same volume they also lay down the rule with reference to purely private nuisances, which have not any public aspect at all, and that is done in the case of Parker vs. Winnipiseogee Lake Cotton and Woolen Company. In a series of resolutions collated by the court, to be found at page 552, they say:
“ A diminution of the value of the premises without irreparable injury is no ground for interference.
“ Where an injunction is granted without a trial at law, it is usually upon the principle of preserving the property until a trial at law can be had. A strong prima facie case of right must be shown, and there must have been no improper delay. The court will consider all the circumstances and exercise a careful discretion.
“ This jurisdiction.is applied only where the right is clearly established; where no adequate compensation can be made in damages, and where the delay itself would be a wrong.
“ The case must be one of strong and imperious necessity, or the right must have been previously established at law.
“ The right must be clear and its violation palpable.
*441 “If the evidence be conflicting and the injury doubtful, this extraordinary remedy will be withheld.
“After the right has been established at law, a court of chancery will not, as of course, interpose by injunction. It will consider all the circumstances, the consequences of such action, and the real equity of the case.”
Now, these are the rules with regard to injunctions that bind the administration of injunctive relief in this court. Apply them to the allegations and the facts in this cause. What are they ? I have already shown that the case of the plaintiff acquired no additional force by reason of the allegation of a public nuisance, because the act having been by authority of law, the question of public nuisance is out of the case. Then, how do they stand with regard to the claim for a private nuisance? What are the pretenses which they set up?
In the first place, as I have said, one of the complainants owns a fped store, one owns a drug store, one owns a hotel, and two own stove stores, in a crowded thoroughfare, Seventh street north. Now, what are'their allegations? 'They are to be found in the fourteenth paragraph of the amended bill. It is to be observed that they do not claim on account of their residence; they do not claim on account of private families; there is no allegation of that sort in the amended bill. They have stricken out the second paragraph of the original bill, and in the second paragraph of their amended bill, they simply aver themselves to be the owners and occupants of certain establishments and buildings in the city of Washington, describing them as applied to the uses which I have just designated. Then in this fourteenth paragraph, they lay down the gravamen oi the injury of which they complain: “That the said poles, if erected, will seriously and materially interfere with the use of the said portion of the said street and the ordinary travel thereon, and will obstruct and impede the ordinary use and enjoyment by the complainants of their said several premises, and the said portion of the said street, both as a highway and for other purposes for which the same, as contiguous to their said *442 several respective premises, is now properly and lawfully used by the complainants.”
Is there anything in that allegation ? The poles, as it appears, are to be placed, according to the proof and tjie sworn answer, at the distance of 150 feet apart along the line of the curbstone and as near as may be upon the dividing line of lots and never in front of the entrance of any house or store along the line of 'the street. That is the sworn answer, that is the proof and that is the fact.
Now, with that fact staring us in the face, is it not too great an appeal to the credulity of any judicial tribunal to say that the erection of poles at intervals of 150 feet along the line of a street can make any substantial impediment to the entrance of any business place on such street ? We have those things, as is matter of public notoriety, all over the city of Washington, all over the crowded cities of New’ York, Philadelphia, Boston, Baltimore, and the western cities. And v;e have not been showm any case in which it has ever been held that these telegraph companies have been restrained from the exercise of their business or the erection of their poles upon the ground that they impeded, in point of fact, the access to any business place within any of these cities. And it cannot, in the nature of things, be that they do, A space of twelve inches which is about the average width of the pole, or fifteen inches, if you please, occupied at intervals of 150 feet, can be no practical-impediment to the approach of any man’s house along any street of the city.
The next allegation, which is part and parcel of the same, is that it will impede and interfere with the complainants, their families and their customers in business in access and approach to, and departure from the said tenements and premises. How can the entrance to a doorway be largely impeded by a pole twelve inches wide one hundred feet off' ? And they do not offer any proof, in point of fact, of any such impediment.
Then they say that the “ wdres proposed to be strung upon the said poles, will, if so strung, be liable to be blowm down and fall upon the said portion of the said street, to the *443 great peril of the complainants, and during the high winds, which prevail in the said city, will create a great and loud hissing and singing noise, to the disturbance of the slee,p and quiet of the complainants residing in their vicinity.”
That is a prospective and imaginary difficulty, and it may be dealt with sufficiently by quoting the language of the Court of Appeals of the State of Missouri in the case of Gay vs. Mutual Union Tel. Co., 12 Mo. Ap., 491:
“ The fears expressed by plaiutiff’s witnesses that the vibrations of the pole may cause the area wall (which prevented the water in a sewer from getting into plaintiff’s cellar), to crack, thus letting water from the sewer into plaintiff’s cellar ; and that, by reason of its great height, it may be blown down in some unprecedented storm, are mere conjectures, of problematical and contingent damage, which is not likely to arise, but which, should it arise, under such circumstances as would impute it to the negligence of defendant, would afford ground for redress in an action at law for damages.”
The utterance of that enlightened court is quite a sufficient answer to problematic danger which these complainants allege here with a view7 to arrest a great work.
The complaint also alleges : a That the said w;ires will, if erected, seriously and materially increase the danger of destruction of the said tenements and buildings by fire, by their liability to attract lightning, and by their bringing into proximity to the said tenements and buildings the action of electricity ; and that they will also seriously hinder, impede and obstruct the operations of the Fire Department of the said city in extinguishing any fire or fires that may occur in and upon the said tenements and buildings, and will interfere with access to and escape from the same in case of necessity on account of such fire or fires.”
This completes the enumeration of the grievances that these parties complain of. The answer to it, besides being obvious to the common sense of every man, will be found, if there be need to refer to author ity, in the case of Rhodes vs. Dunbar, 57 Penn. St. Rep., 274, and in the case of *444 The Mayor of Baltimore vs. Radecke, 49 Md., 228. In this last case there was an application to restrain the erection and maintenance of a carpenter’s shop which was run by a steam boiler in a crowded part of the city, where, as the parties alleged, there was a most imminent danger by reason of the combustible materials used there of setting fire to the adjacent property and by enhancing the insurable risks’ of property on account of this great danger; and that was the point of injunctive relief made by the parties. The Court of Appeals said that the complaint that the business conducted was dangerous, and conducted with combustible materials brought into dangerous proximity to the fme of the boiler of the engine, subjecting their buildings to much hazard and their merchandise to increased danger from fire, raising the prices of insurance and exciting the fears of neighboring owners for the safety and security of their property, were imaginary dangers, and not at all — any one or all of them put together — the occasion for injunctive relief against a legitimate business prosecuted in a legitimate way.
This disposes of each and all of the objections urged in the fourteenth paragraph, so far as they affected the rights of these parties, as the foundation for their claim to a court of chancery for injunctive relief. But, assuming that there was some injury, still that injury would "not of necessity, would not of itself, justify the application to a court of chancery for relief. As I have said, and as the authorities lay down the rule, the court of chancery will consider all the circumstances and equities of the case; and where, as a consequence of its interference, the hardship upon one side would be immeasurably greater than the injuries sustained by the other it will not interpose the extraordinary remedy of. injunction, but will leave the complainant to his action at law. It seems to this court that it would be an extraordinary stretch of power to strike down a great cornmercial agency, to destroy one of the chief instrumentalities of intercommunication in this country, because, peradventure, lightning might be passing along a wire and *445 strike the house of a party who lived near the line of the telegraph, or that it increased the amount of his insurance, or that it made some noise occasionally which excited the nerves of a restless sleeper so that he was made unduly watchful during the hours of the night.
These general views seem to dispose of all the important questions of law in the case, as also they dispose of the special equity set up by the complainants in the cause. In view of everything connected with the case this court is of opinion that there is no foundation whatsoever for the application which has been made for injunctive relief, and that the bill of the complainants ought to be dismissed with costs.